Entered: September 29th, 2025
Signed: September 29th, 2025

**SO ORDERED**



NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### Baltimore Division

| | |
|---|---|
| In re:<br><br>ROBERT J. GASSER,<br><br>    Debtor. | CASE NO. 18-19874-NVA<br><br>CHAPTER 7 |
| In re:<br><br>CHARLES KING and GREGORY KING,<br><br>    Debtors. | CASE NO. 18-19911-NVA<br><br>CHAPTER 7 |
| INDIGO DREAMS, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>ROBERT J. GASSER *ET AL.*,<br><br>    Defendants. | ADVERSARY NOS. 18-00422, 18-00423 |

## MEMORANDUM ORDER
## <u>GRANTING JUDGMENT FOR DEFENDANTS</u>

In this adversary proceeding, the Court considers whether the plaintiff, who was an investor

in a limited liability company, has made a case for nondischargeability of debt against three

individuals who operated the business of the LLC and are now debtors in respective chapter 7

cases. After trial, and for the reasons discussed herein, the Court concludes that the plaintiff does not prevail.

## Jurisdiction

The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334. The United States District Court for the District of Maryland has referred the bankruptcy case and this adversary proceeding to this Court pursuant to 28 U.S.C. § 257(a) and its Local Rule 402. This proceeding involves claims that are statutorily core under 28 U.S.C. § 157(b)(1) and (b)(2). This Court has constitutional authority to enter final orders in this proceeding. To the extent this Court lacks such constitutional authority, this decision constitutes the Court's report and recommendation.

## Factual Background

The chronology of events leading up to this adversary proceeding is born out in detail in the trial transcripts and the parties' post-trial submissions. [ECF Nos. 171, 172, 173, 182, 183, 184, 200, 203]. Drawing on that record, the Court summarizes the relevant background here.

Four Crazy Guys, LLC ("4CG") was formed by Charles King ("Chuck"), Gregory King ("Greg"), Robert Gasser ("Bob") (collectively, the "Defendants"), and John Yelcick ("John") in November 2014, with Chuck and Bob as members, for the purposes of building and operating the Baltimore Eagle, a leather bar in Baltimore.[1] 4CG envisioned that the Baltimore Eagle would include a daytime bar, restaurant and liquor store, retail store, and nightclub. The Baltimore Eagle "brand" was to be acquired from the Parrish family, from which the building in which the Baltimore Eagle would operate was to be leased.

---

[1] Chuck and Greg are married. John and Bob were married; John is also the brother of Mark Yelcick ("Mark"), who is the sole owner and member of Indigo Dreams, LLC ("Indigo"), the plaintiff here.

In order to build out the property for the opening of the Baltimore Eagle, 4CG initially obtained a $300,000 loan from John in March 2015, which was secured by all of 4CG's assets. John was also tasked with maintaining 4CG's books and accounts. In the process of building out the property, 4CG attempted to obtain additional financing from traditional lending institutions, but was unable to obtain loan approval because of unrelated legal troubles John was facing in Pennsylvania that had somehow implicated 4CG.[2] Around July 2016, 4CG learned—to the surprise of its members—that the loan funds from John had been exhausted and that John had not been maintaining 4CG's books. 4CG then obtained additional loans from Michael Garrett ($25,000), Ethel Kaczmarek ($14,000), and Greg ($15,000), but the funds from those loans, too, were apparently quickly exhausted.

With the buildout incomplete and 4CG in need of significant funds to be able to open the Baltimore Eagle, 4CG approached Mark, John's brother, for a loan or investment. Mark is a CPA with a relatively sophisticated business background.[3] In the course of discussions about potential funding from Mark, the Defendants met with Mark and provided him with a business plan. Although Mark voiced significant concerns at the time, including that 4CG "is fundamentally flawed and appears to already be technically bankrupt" (Pl. Ex. 9), Mark ultimately decided to invest $200,000 in 4CG in exchange for a 20% ownership interest in 4CG. The investment was made through Indigo, Mark's LLC, which became a non-managing member of 4CG.

---

[2] The subject matter of John's legal troubles is irrelevant to this proceeding, but it is clear that those troubles influenced the parties' decisions and contributed to the manner in which the personal and professional relationships among the parties soured over the almost two years the parties were in business together.

[3] Mark is a certified public accountant who obtained a degree in economics from the Wharton School at the University of Pennsylvania, majoring in finance and accounting. Before starting his own company, Mark worked as an accountant for Touche Ross, and later Deloitee and Touche. Mark is the chief financial officer and chief technology officer of OnCourse Systems for Education, where he is responsible for, among other things, QuickBooks. The Court qualified him as an expert in business accounting. Hr'g Tr. 10/24 at 53:16–17.

Correspondence among the parties confirms that Mark was not sure that even his $200,000 investment would be sufficient to get the Baltimore Eagle off the ground, but in any event was intended to simply get the Baltimore Eagle open (*i.e.*, the parties did not anticipate any leftover funds from the investment after opening the Baltimore Eagle for further startup / operating costs). In October 2016, a new operating agreement (the "Operating Agreement") that Mark reviewed was executed, adding Indigo as a 20% minority member and reducing Chuck's and Bob's ownership interests to 40% each. The Baltimore Eagle officially opened in January 2017.

Accounting irregularities and issues at 4CG were evident from its inception, even before the Baltimore Eagle opened. Initially, John was responsible for maintaining the 4CG QuickBooks account and 4CG's books. The depletion of John's $300,000 loan came as a surprise when the parties discovered those funds had been entirely spent in July 2016, with at least Chuck believing $100,000 remained in 4CG's account at the time. At some point, piles of paper receipts were discovered at John's home, none of which had been entered in QuickBooks. Around March 2017, Greg took over responsibilities for maintaining 4CG's books and financials from John. Among other things, Greg discovered that no deposits had been entered since the opening of the Baltimore Eagle in January 2017 and that very few checks and expenses had been documented in QuickBooks. Many of the entries that had been entered had never been categorized. For reasons that are not relevant to the subject matter of this proceeding, Chuck, Greg, and Bob locked John out of 4CG's operations around April 2017.

Greg did not possess the training, experience, or ability to manage 4CG's books and only had the time to work on the accounting after hours (i.e., after the Baltimore Eagle had closed). Chuck and Bob also had no experience with accounting or QuickBooks, and could provide no meaningful oversight of Greg's work.

Between August 2017 and October 2017, Mark sought access to 4CG's books and records and specifically, the password to 4CG's QuickBooks account.  For reasons that are not entirely clear from the record but seem largely related to John's personal issues and the Defendants' locking him out of 4CG's operations, the relationship among Mark, his titular partners Chuck and Greg, and Bob soured during that time period.  There was conflicting testimony at trial as to whether the QuickBooks password was provided to Mark when he first requested it.  By September 2017, though, Mark had obtained the password and accessed some of 4CG's financial records.  Thereafter, Mark, engaged his friend Robert Feeney (also an accountant) to assist him and the two of them performed an on-site audit of 4CG's books in October 2017.  The audit uncovered a host of serious issues, including but not limited to:

- Entries recorded in QuickBooks mere hours before the audit occurred;
- Significant overdrafts of 4CG's bank account;
- Entries recorded in QuickBooks that had not cleared the bank account;
- No reconciliation of the bank account since April 30, 2017;
- Mischaracterized and uncharacterized transactions; and,
- Unpaid federal and state withholding taxes.

Following the on-site audit, the parties' working relationship appears to have ended completely.

During the next month (November 2017), Indigo filed suit in state court against 4CG and the Defendants, alleging breach of fiduciary duty and fraud against the Defendants, and seeking an accounting, dissolution, and a receivership of 4CG.  A hearing on Indigo's request for a receiver was not held until September 2018; in the intervening year, the Baltimore Eagle closed and the Defendants each filed for bankruptcy.  In October 2018, the state court appointed a receiver for 4CG, who was able to distribute $130,374.30, all of which was paid to John on account of his outstanding loan to 4CG.

## Procedural Background

Indigo commenced the instant adversary proceedings against the Defendants on November 5, 2018.  In identical complaints, Indigo asserts nondischargeability causes of action under sections 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code (Counts I, II, and III, respectively) against the Defendants alleging purportedly improper conduct by the Defendants in (i) obtaining Indigo's investment, (ii) managing the Baltimore Eagle, (iii) maintaining 4CG's books and records, and (iv) closing the Baltimore Eagle.  The first year of litigation was consumed almost entirely by a series of discovery disputes.  [ECF Nos. 26, 27, 29, 30, 34, 35, 36, 37, 40, 41, 43, 44, 48, 50].  Trial was originally set for July 20–22, 2020 and August 10, 2020, but a series of further discovery disputes and dispositive motions led to several status conferences that resulted in trial being postponed.  A final, pre-trial status conference was continued several times at the parties' requests, based largely on the fact that the COVID-19 pandemic precluded in-person hearings for some time.

The first three days of trial were held on October 24–26, 2023.  [ECF Nos. 165, 166, 167].  Due to scheduling conflicts of the parties, the final three days of trial were not held until February 27–29, 2024.  [ECF Nos. 170, 177, 178].  The Court directed the parties to submit post-trial briefing, which the parties filed on October 1, 2024.  [ECF Nos. 200, 203].  Closing arguments were heard on October 11, 2024.  [ECF No. 204].

## Analysis and Discussion

"The bankruptcy discharge is a hallmark of U.S. bankruptcy law … and it is one of the primary policy objectives underlying the [Bankruptcy] Code."  *In re Durant*, 586 B.R. 577, 583 (Bankr. D. Md. 2018).  Consistent with this policy objective, courts interpret the exceptions to discharge set forth in section 523 of the Bankruptcy Code narrowly, and require the objecting creditor to prove each element of a claim of nondischargeability by a preponderance of the

evidence. *In re Rountree*, 478 F.3d 215, 219 (4th Cir. 2007) (exceptions to discharge construed narrowly to preserve Code's overarching purpose of providing fresh start); *In re Biondo*, 180 F.3d 126, 130 (4th Cir. 1999) ("When addressing exceptions to discharge, we traditionally interpret the exceptions narrowly to protect the purpose of providing debtors a fresh start."); *In re Durant*, 586 B.R. at 583 ("[C]ourts generally interpret the exceptions to discharge set forth in section 523 of the Code narrowly, and the objecting creditor bears the burden of proof."); *In re Koep*, 334 B.R. 364, 371 (Bankr. D. Md. 2005) ("[E]xceptions to discharge are strictly construed against creditors in order to protect a debtor's fresh start.").

"Analyzing whether a creditor holds a nondischargeable claim is a two-step process. The creditor must first establish that a debt is owed to the creditor by the debtor. [] Once the debt is established, the question becomes whether the debt is nondischargeable under Section 523(a)." *In re Cockey*, 622 B.R. 178, 186 (Bankr. D. Md. 2020). *See also In re Woods*, 660 B.R. 905, 915–16 (10th Cir. BAP (Colo.) 2024) ("First, the creditor must establish a debt is owed by the debtor to the creditor under applicable nonbankruptcy law. If that showing is made, the creditor must then show that the debt is excepted from the discharge."); *In re Burkhalter*, 635 B.R. 284, 289 (Bankr. N.D. Miss. 2022) ("The plaintiff must first show that she holds a valid claim against the debtor. If successful, the plaintiff must then demonstrate how and why that claim is nondischargeable under the Bankruptcy Code.").

I.     Indigo Has Not Established the Existence of Any Debt

Indigo initiated these adversary proceedings without having previously established that it is owed any debt by either Chuck, Greg, or Bob. Although Indigo sued the Defendants in state court, that litigation was stayed by each of the Defendants' bankruptcy filings pursuant to section 362(a) of the Bankruptcy Code. Indigo never sought relief from the automatic stay during the

pendency of any of the Defendants' individual bankruptcy cases to conclude the litigation in state court, where Indigo could have obtained—but not enforced—any judgment awarded to it.  Nor was any evidence presented that Indigo resumed the state court litigation upon the entry of discharge in the Defendants' individual bankruptcy cases[4] when the automatic stay terminated. *See* 11 U.S.C. § 362(c)(2)(C) (automatic stay terminates as to individual debtor in chapter 7 when "a discharge is granted or denied").  In sum, Indigo appears here without any judgment or state court determination that it is owed any debt by any of the Defendants.[5]

Where, as here, a plaintiff seeks a nondischargeability determination without first having obtained a judgment concerning the existence of a debt, "the bankruptcy court has subject matter jurisdiction in the first instance to determine both the existence and the amount of the debt, and in the second instance, to decide whether the debt found to exist is dischargeable or nondischargeable." *In re Janssens*, 449 B.R. 42, 66 (Bankr. D. Md. 2010), *aff'd sub nom. Janssens v. Freedom Med., Inc.*, No. CIV. JFM-10-2042, 2011 WL 1642575 (D. Md. Apr. 29, 2011); *see also In re Freeland*, 360 B.R. 108, 129 (Bankr. D. Md. 2006) (bankruptcy court may determine nondischargeability and "liquidate the amount of the debt and enter a nondischargeable judgment therefor[.]").

Here, despite six (6) days of trial and nearly 100 exhibits, Indigo failed to establish that any of the Defendants owe it a debt.  For each claim against the Defendants, Indigo seeks a judgment for "[a] principal amount in excess of $75,000."  Gasser Compl. at 13, 14, 15; Kings Compl. at 13, 15, 16.  Neither complaint provides any basis for this figure, or how much "in

---

[4] Chuck and Greg received their discharges on March 5, 2019; Bob received a discharge on February 11, 2020. Pursuant to the respective orders entered in the underlying bankruptcy cases, the entry of discharge would not discharge any debt owed to Indigo if Indigo were to have prevailed in this adversary proceeding.

[5] Indigo did not file a proof of claim in either of the underlying bankruptcy cases.  Chuck and Greg did not identify Indigo as a creditor in their bankruptcy case; Bob listed Indigo as an unsecured creditor in his Schedule E/F and marked the claim as "Disputed."  *See* Case No. 18-19874-NVA [ECF No. 20].

excess" of this amount a judgment should be.  More importantly, Indigo did not present any evidence of actual damages it suffered as a result of any of the alleged misconduct of the Defendants.  Nor did Indigo present any evidence as to the actual, current value of 4CG or as to any hypothetical value 4CG might have had, but for the Defendants' alleged misconduct.

Even assuming the Court makes a surmise that the damages Indigo is attempting to allege constitute profits or distributions it should have received as a member of 4CG, Indigo offered no evidence that it was ever entitled to receive same.  The Operating Agreement outlined specific conditions precedent to the allocation of any profits or distributions: a minimum percentage (40%) of taxable profits would be distributed to members in accordance with their percentage ownership interest *only after* "active" members (i.e., Chuck and Bob) and their spouses (i.e., Greg) received up to $50,000 each in salary and benefits (or $75,000 each if annual revenues exceeded $2,000,000).  In other words, the only scenario in which Indigo would ever receive a penny in distributions is if Chuck, Greg, and Bob each took home $50,000 first.  At no time during the trial did Indigo establish that Chuck, Greg, or Bob ever received $50,000; by failing to do so, Indigo also failed to establish that it was ever entitled to receive any distributions under the terms of the Operating Agreement.

At one point, Mark testified that he "could have" injected additional capital, yet at another point, he testified he would "have never recapitalized the business[.]"  *Compare* Hr'g Tr. 10/25 at 35:8 *with* Hr' Tr. 10/26 at 156:12–14.  To the extent the Court surmises that Indigo's alleged damages are hypothetical lost future earnings or value Indigo might have derived from recapitalization, Indigo offered no evidence at trial that it was prepared to recapitalize 4CG or that it had specific funds available for such an endeavor.  Nor did Indigo provide any evidence that any such recapitalization would have resulted in the Baltimore Eagle remaining open or generating

sufficient annual revenue to warrant distributions to members under the terms of the Operating Agreement. Mark's testimony on this point was heavy on hypothetical possibilities and light on actual certainties, and insufficient to support a claim for damages based on alleged lost future earnings and business value.

And to the extent Indigo's damages are (i) its $200,000 ***investment*** in 4CG which was allegedly induced by the Defendants' through false representations (Count I), (ii) from an alleged breach of fiduciary duty owed to Indigo (Count II), or (iii) from alleged "willful or malicious injury" by the Defendants (Count III), the Court is not convinced. The Court dispenses with these theories of nondischargeability in its analysis *infra* at sections II.A, B, and C of this ruling.

In sum, Indigo has not established that it is owed a debt as required under section 523(a). For this reason alone, judgment in favor of the each of the Defendants is proper as a matter of law.

II.    <u>Indigo Has Not Established That Any Debt Would Be Non-Dischargeable</u>

Assuming *arguendo* that Indigo ***had*** established that some debt was owed under section 523(a), it would then have to prove that the debt was nondischargeable. Here, Indigo has raised claims of nondischargeability under three subsections of section 523(a):

(i)    subsection (2)(A), which excepts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by [] false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;"

(ii)    subsection (4), which excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;" and,

(iii)    subsection (6), which excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]"

11 U.S.C. § 523(a)(2)(A), (4), (6). Indigo's claims fail under sections (a)(2)(A), (4), and (6). The Court discusses each claim in turn.

10

A.    Non-Dischargeability Under Section (a)(2)(A) (Count I)

The Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by … false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."   11 U.S.C. § 523(a)(2)(A).   A creditor asserting a claim under section 523(a)(2)(A) must prove each one of five elements by a preponderance of the evidence: "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages."  *In re Rountree*, 478 F.3d at 218.   The debtor's intent is determined subjectively considering the totality of the relevant circumstances.   *In re Cleary*, 487 B.R. 633, 642 (Bankr. D. Md. 2013), *aff'd*, No. ADV 08-00264, 2013 WL 6713188 (D. Md. Dec. 18, 2013), *aff'd sub nom. Limberger v. Cleary*, 585 F. App'x 165 (4th Cir. 2014) (citations omitted).   The creditor's reliance must be justifiable, as opposed to reasonable, and that element is likewise assessed in accordance with the overall circumstances of the case.   *Id.* (citing *Field v. Mans*, 516 U.S. 59, 73 (1995); *In re Sharp*, 340 Fed. Appx. 899, 905 (4th Cir. 2009)).   It is not necessary that misrepresentations be communicated directly to the creditor, so long as there is reason to expect that the creditor will rely on the misrepresentation and that her conduct will be detrimentally influenced thereby.   *In re Cleary*, 487 B.R. at 642 (citing *Sempione v. Provident Bank of Md.*, 75 F.3d 951, 962 (4th Cir. 1996)).

The purpose behind section 523(a)(2) is "to protect creditors who were tricked by debtors into loaning them money or giving them property, services, or credit through fraudulent means." *In re Rountree*, 478 F.3d at 219–20.   In order to prevail on a claim under section 523(a)(2)(A), the creditor must prove that "the debtor fraudulently took something of value, such as money, property, or services, from the creditor."   *In re Rountree*, 330 B.R. 166, 172 (E.D. Va. 2004), *aff'd*, 478 F.3d

215 (4th Cir. 2007). Stated differently, to prevail on its claim of nondischargeability under (2)(A), Indigo must prove that Chuck, Greg, and Gasser *each obtained* "money, property, or services" *from Indigo* by "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).

Indigo's claim under this subsection fails for several reasons. First, Indigo failed to establish that either Chuck, Greg, or Bob obtained any "money, property, or services" from Indigo. Rather, the evidence shows that *4CG obtained* "money, property, or services" from Indigo: to wit, the $200,000 *Indigo invested in 4CG* in exchange for a 20% ownership interest in October 2016. Indigo gave nothing directly to Chuck, Greg, or Bob. "Both the plain language of the statute and the Supreme Court's interpretation of that language lead us to require for exception to discharge that the debtor have fraudulently obtained money, property, services, or credit." *In re Rountree*, 478 F.3d at 222 (exception to discharge under section 523(a)(2)(A) does not apply where debtor obtained nothing, even if fraud occurred and creditor suffered damages). Because Indigo has not shown that any of the Defendants obtained "money, property, or services" from Indigo, Indigo has failed to meet its burden to sustain a claim under section 523(a)(2)(A).

Second, even assuming Indigo had proved that each of the Defendants obtained "money, property, or services" from Indigo, Indigo failed to produce evidence to prove any of the five elements required to sustain its claim under section 523(a)(2)(A). The first element requires proof of a false representation; Indigo maintains that some of the alleged representations were made *pre-investment* and others were made *post-investment*. Indigo identifies the following representations it alleges were false and made *prior to* the time it made its $200,000 investment:

> 123. [Defendants] made false representations to Indigo that [they] would manage the operations of 4CG, properly account for 4CG's revenues and profits, and remit a portion of 4CG's profits to Indigo where appropriate.

124. [Defendants] made false representations to Indigo that [they] would maintain proper accounting records documenting 4CG's finances to ensure 4CG's operation.

125. [Defendants] made false representations to Indigo that 4CG was profitable.

126. [Defendants] made these false representations to Indigo to induce Indigo to contribute $200,000.00 in exchange for a 20% ownership interest in 4CG.

Gasser Compl. at 12; Kings Compl. at 13.  These pre-investment statements relate to future facts.  "In order for a statement to qualify as a false representation under Section 523(a)(2)(A), 'the statement must relate to a present or past fact.'"  *In re Owens*, 549 B.R. 337, 355 (Bankr. D. Md. 2016) (quoting *In re Conlin*, 294 B.R. 88, 100 (Bankr. D. Minn. 2003)); *see also In re Casali*, 517 B.R. 835, 843 (Bankr. N.D. Ill. 2014) ("A false representation under § 523(a)(2)(A) must relate to a present or past fact … [a] promise constitutes a false representation under § 523(a)(2)(A) only if the debtor made the promise without an intention of ever keeping it.").

The second and third elements require that Indigo establish the knowing falsity of these statements when they were made and that the Defendants intended to deceive Indigo.  Indigo offered no evidence to satisfy either element.  No evidence exists that, for example, the Defendants did not intend properly managing the Baltimore Eagle and 4CG's books and records when they said they would do so.  Nor does any evidence establish that 4CG would ever have been profitable; to the contrary, the evidence established that Indigo's $200,000 investment was not even sufficient to get the Baltimore Eagle to open.  And Indigo failed to establish that any of these statements— even if they were knowingly false—were made with the intent to deceive Indigo, whether into investing $200,000 or otherwise.  All of the testimony at trial reflected the Defendants' earnest efforts, even if at times poorly conceived or executed, to open the Baltimore Eagle, and to keep it open and hopefully to make it profitable someday.  Chuck, Greg, and Bob each testified

convincingly that they were doing their very best to make this venture work, despite the many challenges they faced, including their lack of experience in or familiarity with financial recordkeeping. They were credible witnesses and the Court believes their testimony that they intended to make 4CG successful and profitable. The totality of the relevant circumstances here does not support a finding that any of the Defendants acted with the requisite intent to deceive Indigo, even if *arguendo* the Defendants had made knowingly false representations.

To the extent Indigo relied on any of these statements (and assuming the statements were knowingly false and made with the intent to deceive Indigo), Indigo's reliance on these statements in deciding to invest $200,000 was not justified, as required by the fourth element. ***Before agreeing to invest***, Mark said he knew that 4CG was "fundamentally flawed and appears to already be technically bankrupt" (Pl. Ex. 9). He also voiced other significant concerns about the business plan, budget, and build out costs ***before agreeing to invest*** in a nearly three-page email. *Id.* That Indigo still decided to invest $200,000 after Mark's significant criticisms of 4CG belies any notion that he justifiably relied on the Defendants' pre-investment statements.

Indigo also identifies several alleged acts that occurred ***after*** it made its $200,000 investment. It appears to allege that the following such acts would support a finding of nondischargeability under section 523(a)(2)(A):

> 121. [Defendants] fraudulently conveyed 4CG's assets to [themselves] and third parties.
>
> 122. [Defendants'] removal of the assets left 4CG insolvent and unable to meet its debts as they mature in the usual course of business.
>
> 127. [Defendants] deliberately concealed [their] intentions and activities from Indigo concerning the disposition of 4CG's assets.
>
> 128. [Defendants] deliberately falsified 4CG's accounting records to prevent Indigo from discovering 4CG' s actual financial situation.

> 129. [Defendants] requested a continuance of the Receivership Hearing for the purpose of absconding with all of 4CG's assets before Indigo obtained a Court Order appointing a receiver.

Gasser Compl. at 12–13; Kings Compl. at 13–14.  While these acts may support some other cause of action, they are not the type of conduct proscribed by section 523(a)(2)(A).  With respect to the conduct alleged in the Complaint, Indigo has not produced any evidence that the statements or acts of the Defendants are the kind of statements that fall within the narrow confines of section 523(a)(2)(A).  Further, even if they were, the Court has previously noted that it finds the Defendants' testimony to be credible and thus cannot find from the record in this case that the Defendants deliberately concealed their intentions or falsified records, that they had fraudulent intent, or that they acted with a purpose of absconding with assets.

If it is Indigo's position here that the Defendants withheld material information concerning 4CG's finances and that Indigo, in reliance on the absence of any bad financial information, chose not to recapitalize 4CG, it must be recalled, as pointed out *supra*, that nothing in the record establishes a link between the failure to recapitalize and any damages.  The Operating Agreement required a minimum of $2,000,000 revenue before distribution of profits and losses and even then, only after members who were active in day-to-day operations were paid up to $75,000.  No evidence exists that 4CG ever came within the ballpark of $2,000,000 in revenue—or could have— or that any recapitalization of 4CG would have helped achieve this financial metric.  All assets of 4CG secured John's $300,000 loan.  In addition, no financial evidence was introduced to establish that the "removal of assets" was the cause of 4CG's insolvency.  No valuation evidence of any sort was presented, either.

B.    Nondischargeability Under (a)(4) (Count II)

In Count II, Indigo alleges that Chuck, Greg, and Bob each individually owed fiduciary duties to Indigo and that each committed defalcation of those duties.  Section 523(a)(4) provides an exception to discharge "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).[6]  "[F]raud means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong. Similarly, defalcation means an intentional wrong or a finding that the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty."  *In re Durant*, 586 B.R. at 583-84 (cleaned up).

A plaintiff alleging a claim under section 523(a)(4) must prove both that "the debt … arose while the debtor was acting in a fiduciary capacity[,] and … that the debt arose from the debtor's fraud or defalcation."  *In re Strack*, 524 F.3d 493, 497 (4th Cir. 2008) (citing *In re Ansari*, 113 F.3d 17, 20 (4th Cir. 2017)).  Put another way, the nondischargeability analysis under section 523(a)(4) is a two-step process.  "The first step is to determine whether a fiduciary relationship existed prior to the transaction which produced the debt.  … the second step is to examine if fraud or defalcation occurred during that relationship."  *In re Rosen*, 232 B.R. 284, 295–96 (Bankr. E.D.N.Y. 1999); *see also In re Michelena*, 641 B.R. 325, 338 (Bankr. S.D. Tex. 2022); *In re Vito*, 598 B.R. 809, 817 (Bankr. D. Md. 2019) ("Courts evaluating fiduciary-related claims under section 523(a)(4) of the Code require proof of a traditional fiduciary relationship and evidence of fraud or defalcation by the debtor while acting in a fiduciary capacity.").

Not all relationships of reliance rise to the degree of trust required for a finding of defalcation.  "The definition of 'fiduciary' for purposes of section 523(a)(4) is controlled by federal

---

[6] Neither embezzlement nor larceny are pled by Indigo here.

common law and is narrower than under general common law." *In re Harrell*, 173 F.3d 850 (4th Cir. 1999); *see also In re Vito*, 598 B.R. at 817 ("The Code does not define the term 'fiduciary' as used in section 523(a)(4). Rather, this Court must look to applicable federal and state law. Courts generally agree that whether a debtor is acting as a fiduciary for purposes of section 523(a)(4) is determined by federal law."); *In re Heilman*, 241 B.R. 137, 158–59 (Bankr. D. Md. 1999) ("Even though the Bankruptcy Code does not define "fiduciary capacity," the term is to be narrowly construed in the context of dischargeability of debts in bankruptcy.").

In this vein, the Fourth Circuit has limited the application of section 523(a)(4) "to instances involving express [sic] or technical trusts." *In re Harrell*, 173 F.3d 850; *see also In re Heilman*, 241 B.R. at 159, 169–70 ("Since 1844, it has been held that only an express or technical trust can create a fiduciary capacity for purposes of nondischargeability of debt by a fiduciary in bankruptcy. [] The types of fiduciary capacity intended by Congress to render a debt nondischargeable are persons in positions of ultimate trust, such as public officers, executors, administrators, guardians, trustees of express trusts, attorneys and corporate directors."); *In re Hildebrand*, 230 B.R. 72, 76 (Bankr. D. Md. 1999) ("While Maryland law, as it previously existed, indicates that partners were fiduciaries of the partnership, not all trust duties under state law are sufficient to create the necessary fiduciary relationship under the federal standard required for application of the defalcation provision of 11 U.S.C. § 523(a)(4)."); *In re Marino*, 115 B.R. 863, 868 (Bankr. D. Md. 1990) ("For a trust relationship to satisfy the fiduciary capacity requirement of 11 U.S.C. § 523(a)(4), the trust on which it is based must be a technical trust in existence at the time of the defalcation."); *In re Holmes*, 117 B.R. 848, 852 (Bankr. D. Md. 1990) ("In order for a debt to be nondischargeable under Section 523(a)(4) arising from a breach of fiduciary duty, the debtor must have been acting as a trustee of an express or technical trust.").

With this limitation in mind, three factors guide the Court's analysis here: "(1) the establishment of an express trust regarding the funds; (2) that the debtor acted in a fiduciary capacity; and (3) the debt is based upon the debtor's fraud or defalcation while acting as a fiduciary." *In re Durant*, 586 B.R. at 587 (cleaned up). Indigo did not present any evidence from which the Court could find that either an express or technical trust existed between Indigo and the Defendants. Under **Maryland law** "[m]anaging members of an LLC owe fiduciary duties to the LLC and the minority members arising under traditional common law agency principles." *Plank v. Cherneski*, 469 Md. 548, 572 (2020). But "common law agency principles" do not give rise to the kind of express or technical trust required for a claim under section 523(a)(4). *See* 4 COLLIER ON BANKRUPTCY ¶ 523.10 (16th ed. 2009). Nor do those principles comport with the Fourth Circuit's narrow application of a fiduciary under the **federal** common law. *In re Harrell*, 173 F.3d 850.[7]

Indigo offered no evidence to suggest that any kind of express or technical trust was created; or that Chuck, Greg, or Bob agreed to hold funds in trust; or that Chuck, Greg, or Bob agreed to act in a fiduciary capacity as contemplated under the Bankruptcy Code.[8] Although Indigo elicited testimony from Chuck and Bob that each believed he owed a fiduciary duty to Indigo, that testimony alone cannot create the kind of fiduciary duty required to sustain a claim under section 523(a)(4). Because Indigo did not satisfy either of the first two factors (the existence

---

[7] Some courts recognize that a claim brought pursuant to section 523(a)(4) may be viable when it relies on a trust created by state statute. *See, e.g.*, *In re Johnson*, 691 F.2d 249, 252 (6th Cir. 1982). Here, the Maryland Limited Liability Company Act contains no provision or language establishing or defining any type of trust relationship among members of an LLC. *See generally* Md. Code Ann., Corps. & Ass'ns § 4A-401 *et seq.*

[8] Even if it were possible to apply Maryland common law fiduciary duties to a claim under section 523(a)(4), those duties are only owed by managing members to minority members in an LLC. *Plank v. Cherneski*, 469 Md. at 572. The Operating Agreement for 4CG identifies Chuck and Bob as the only managing members of 4CG. Greg is not a managing member, and therefore under Maryland law, Greg owed no statutory fiduciary duties to Indigo.

of a trust and that the Defendants acted in a fiduciary capacity), the Court dispenses with any analysis of the third factor (that the alleged debt is based on the Defendants' fraud or defalcation).

### C.    Nondischargeability Under (a)(6) (Count III)

Under subsection (a)(6), a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable.  The Supreme Court and the Fourth Circuit have held that a debt arising from an injury attributable to mere negligent or reckless conduct does not satisfy the "willful and malicious" requirement of section 523(a)(6).  *In re Muhs*, 923 F.3d 377, 385 (4th Cir. 2019) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 60 (1998)).  Rather, there must be a specific "inten[t] to injure." *In re Duncan*, 448 F.3d 725, 730 (4th Cir. 2006); *see also Geiger*, 523 U.S. at 61 (A plaintiff must prove "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."); *In re Muhs*, 923 F.3d at 385 ("[I] is not enough that the conduct underlying the injury was intentional. Rather, the debtor must have engaged in such conduct with the actual intent to cause injury.").

No documentary evidence or testimony shows that any of the Defendants intended to injure Indigo, even assuming Indigo sustained an injury cognizable under the Bankruptcy Code for purposes of nondischargeability.  To the contrary, the Defendants' testimony consistently showed that they were doing their best, relative to their knowledge and skill, to keep the Baltimore Eagle open despite obvious financial challenges that began before the doors even opened and continued until the Baltimore Eagle was closed.  Each of the Defendants testified convincingly that the reason behind the acts Indigo complains of was to save the business.  At no time did Indigo establish, either directly or by inference, that any of the Defendants intended any of their acts to harm Indigo. At best, Indigo only established that the Defendants may have been negligent or reckless in managing the Baltimore Eagle and 4CG's books, especially given Greg's lack of qualifications to

manage the financial accounting.  The evidence also suggests that very little of what actually occurred should have come as a surprise to anyone, including Indigo, given the disconnect between 4CG's ambitions for the Baltimore Eagle and the financial realities that became apparent even before the Baltimore Eagle opened.  The Court cannot discern any intent to harm Indigo from any of the testimony or evidence presented at trial.

III.    Coda

A few final points bear discussion here.  Indigo spills much ink on a number of complaints that have no basis in the Operating Agreement that governs its relationship with Chuck and Bob (Greg was not a member of 4CG at any point in time).  For example, Indigo complains about

- various loans 4CG took out, both pre- and post-investment, to complain that it was never notified about those loans—but the Operating Agreement contains no requirement for such notice and imposes no duty on any member to inform any other member about such loans, either before or after they are executed (*see, e.g.*, Pl. Ex. 11 §§ 3.3, 5.1)

- the Defendants' alleged breach of their duty to maintain accurate books and records—but ignores that the very same duty was imposed on Indigo and failed to demonstrate that Indigo satisfied this duty to the other members of 4CG (*see id.* § 8.2)

- a liquor license application submitted by Chuck that included Lorraine Parrish as a 1% owner 4CG that Mark did not authorize—but, again, the Operating Agreement contained no requirement that all members authorize any business conducted in 4CG's name and Indigo specifically ceded operational control of 4CG to Chuck and Bob as managing members (*see generally id.*)

- Greg's completely separate business (a tile company) filing for bankruptcy—but again, the Operating Agreement contained no requirement that a non-nonmember inform any member about the happenings of another, unrelated business (*see generally id.*)

- the Defendants receiving salaries for working at the Baltimore Eagle, on the theory that at least Chuck and Bob were required to put "sweat equity" into the venture without pay as their contribution—but again, the Operating Agreement contained no requirement that any member work without pay (*see id.* ¶ 5.2, which states precisely the opposite)

- Greg's failure to volunteer financial information to Mark in July 2017, before Mark began asking for access to 4CG's books—but again, the Operating Agreement

contained no requirement that financial information had to be provided to any member absent demand (*see id.* ¶ 8)

At its core, this Court is a court of equity. *Young v. United States*, 535 U.S. 43, 50 (2002) ("[B]ankruptcy courts [] are courts of equity[.]"); *French v. Long*, 42 F.2d 45, 47 (4th Cir. 1930) ("A court of Bankruptcy is a court of equity."). A fundamental tenet of a court of equity is that a "plaintiff is not entitled to relief from a court of equity in the form of an order denying the dischargeability of debt [when] he has not come into court with clean hands." *In re Bromley*, 126 B.R. 220, 223 (Bankr. D. Md. 1991).

The evidence presented at trial established that (i) 4CG was in a precarious financial position long before the doors of the Baltimore Eagle opened; (ii) Indigo was keenly aware of this before it invested $200,000, including because Mark had reviewed a proposed business plan and 4CG's books and because Indigo's sole member's brother, John, was responsible for those books; (iii) Indigo became even more keenly aware of 4CG's financial problems post-investment when Mark attempted to help John clean up some of the books between January 2017 and March 2017; and (iv) Mark was the only individual remotely qualified to manage 4CG's books, but chose not to, even though the Operating Agreement imposed a duty on Indigo to do so that was co-equal to the duty imposed on Chuck and Bob.

To find in favor of Indigo in this case based on its complaints about poor financial recordkeeping and accounting, that resulted from the admitted and known inexperience of the individuals tasked with keeping the books, while Indigo's member, a certified public accountant, essentially sat back and watched the business slowly fail, would contradict notions of equity. At no point in time between March 2017, when his brother John was locked out of the business, and October 2017, when Mark conducted the on-site audit of the books, did Mark volunteer to help Greg manage the books or to manage them himself. Mark knew the books were a mess in March

2017, and he knew that Greg had no formal training in QuickBooks, accounting, or finance generally, but—for reasons unknown to this Court—Mark seemed content to allow Greg to manage the books.  That serious mistakes were made should have come as no surprise to anyone, especially to a CPA with a savvy business background.  But none of that gives rise to evidence sufficient to find either (i) the existence of any "debt" the Defendants owe to Indigo, or (ii) that any such debt is nondischargeable under section 523(a)(2)(A), (2)(4), or (2)(6) of the Bankruptcy Code.

In simplest terms, this is a story of a business venture gone sadly wrong, resulting in a frustrated investor.  That, however, does not justify the relief Indigo seeks here.

## <u>Conclusion</u>

For the foregoing reasons, the Court concludes that Indigo has failed to make the showings required to declare any debt owed by the Defendants nondischargeable.  Accordingly, it is, by the United States Bankruptcy Court for the District of Maryland,

**ORDERED**, that judgment is entered in favor of Charles King, Gregory King, and Robert Gasser.

cc:    Plaintiff's Counsel – Shawn Whittaker, Scott Myers
       Defendants' Counsel – Marc Ominsky, Timothy Mummert

## END OF MEMORANDUM ORDER